# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**E.O.R.,**
**Petitioner,**

**vs) No. 17-0355**  (Upshur County 13-D-131)

**M.D.W.,**
**Respondent.**

**FILED**

**March 8, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner, E.O.R.[1] ("Father"), by counsel, Shannon R. Thomas, appeals an order entered in the Circuit Court of Upshur County. In its order, the circuit court refused Father's petition for appeal from an order by the Family Court of Upshur County in which the family court allocated custodial and decision-making responsibility over his son, I.W., 50% to Father and 50% to I.W.'s mother, M.D.W. ("Mother"). Mother, by counsel, David B. DeMoss, filed a response, to which Father filed a reply.[2]

This Court has considered the parties' briefs, oral arguments, and the record on appeal. Upon consideration of the standard of review, the briefs, oral arguments, and the record presented, we find no error in the circuit court's decision to refuse Father's petition for appeal. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure. However, at oral argument, this Court received information from I.W.'s Guardian ad Litem that, after the family court entered its order, circumstances regarding Father's and Mother's ability to share custodial and decision-making responsibility over I.W. may have changed. Therefore, we remand this case to the family court for a new hearing as to whether a change in circumstances warrants a modification of its previous order allocating custodial and decision-making responsibility over I.W. 50% to Father and 50% to Mother. The hearing shall be conducted promptly, but no later than four weeks from the entry of this decision.

This case arises from a custody dispute between Father and Mother over their child, I.W., who was born in August 2012 and is now five years old. Father and Mother never married and did not live together during I.W.'s lifetime.

Father's and Mother's relationship was marked with contention, and Mother claims that Father physically abused her on the following three occasions: (1) In summer 2012, Father

---

[1] Consistent with our practice in cases involving sensitive matters, we identify the parties by their initials. W.Va. R. of App. P. 40(e) [2017]; *See also, State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] I.W. is represented by Cheryl E. LaNasa, Guardian ad Litem, who appeared at oral argument, but did not file a brief.

1

purportedly pushed Mother to the ground when she was seven months pregnant with I.W.; (2) In June 2013, when I.W. was less than one year old, Father allegedly showed up unannounced at Mother's house, hit her, and tried to leave with I.W.; and (3) In September 2014, when I.W. was two years old, Father struck Mother in the chest with his shoulder during an exchange of I.W. at a local gas station. The September 2014 incident was caught, in part, on the gas station's surveillance tape. A magistrate court issued a domestic violence emergency protective order against Father resulting from the September 2014 incident, but the order was terminated at Mother's request two weeks after it was issued.

After the purported June 2013 incident, Mother stopped allowing Father to see I.W. In response, in July 2013, Father filed a Petition for Allocation of Custodial Responsibility in the family court. The case remained before the family court for nearly three years, until, on January 31, 2016, the family court entered its order allocating custodial and decision-making responsibility over I.W. 50% to Father and 50% to Mother. Under this order, I.W. was to alternate between his Father's and Mother's household, with exchanges taking place every Friday at a designated gas station.

In its January 31, 2016, order, the family court weighed the negatives and the positives of allocating shared custodial and decision-making responsibility over I.W. to Father and Mother. As negatives, the family court noted that the Father and Mother have a remarkably contentious relationship which has resulted in behavior that could harm I.W. As to Father, the family court expressed its concern that he might have a propensity to commit domestic violence. The family court indicated in its order that it found Mother's allegations of abuse credible as to the summer 2012 incident (when she was pregnant) and the September 2014 incident (when I.W. was two years old).[3] As to Mother, the family court expressed its belief that her allegation of abuse in

---

[3] The family court did not explicitly state which accusations of abuse by Mother it found credible, but it made the following findings of fact, which indicate its belief that Mother was truthful as to the summer 2012 purported incident and the September 2014 purported incident:

> There have been three incidents of domestic violence. The seven month pregnancy [summer 2012] which occurred at the Mother's apartment. The [June 2013 incident], I find, did not occur, and it is very trouble[some], because it looked like the Mother bore false testimony against the Father. The [September 2014] incident did not rise to domestic violence, but certainly was not gentlemanly, and seemed to indicate that the Father's frustration could easily boil over to a physical confrontation with the Mother.
> . . .
> The Court has domestic violence concerns on the Father with the first [summer 2012] incident which occurred when she was eight months or seven months pregnant . . . [and] The [September 2014] incident involving the shouldering.
> . . .

June 2013 was not truthful. The family court also found that Mother persistently interfered with Father's relationship with I.W., and "has thrown one impediment after another to the Father's meaningful parenting time with the child."

As positives, the family court noted that both parents have a loving relationship with I.W. It recognized that Mother has been I.W.'s primary caretaker for his entire life, and it found that Father has demonstrated his willingness to participate in the care, rearing, and support of I.W. The family court also considered testimony from two psychologists who worked with Father, Mother, and I.W. that "50/50 parenting time was the best."

Accordingly, in its January 31, 2016, order, the family court determined that allocating custodial and decision-making responsibility over I.W. 50% to Father and 50% to Mother was in I.W.'s best interests. However, due to Father's and Mother's contentious relationship, the family court provided that a family court monitor would be appointed to resolve parenting disputes between Father and Mother outside of court, but subject to judicial review. In the same order, the family court denied Father's petition to change I.W.'s last name, and it ordered Father to pay Mother monthly child support in the amount of $438.45.

Both parties separately petitioned the circuit court for an appeal of the family court's January 31, 2016, order. The circuit court entered an order on March 9, 2017,[4] finding that the family court did not abuse its discretion and denying both parties' separate petitions for appeal.

To this Court, Father appeals the circuit court's refusal of his petition for appeal from the family court order. He asserts the following nine assignments of error: (1) the family court's allocation of 50% custodial and decision-making responsibility to Mother violated West Virginia Code § 48-9-209 [2008]; (2) the family court's allocation of 50% custodial responsibility to Mother was manifestly harmful to I.W. in violation of West Virginia Code § 48-9-206 [2001]; (3) the family court erred by appointing a family court monitor to resolve parenting disputes between Father and Mother; (4) the family court erred by failing to grant his petition to change I.W.'s last name; (5) the family court erred in calculating child support due to Mother; (6) the

---

The Father has, on at least two occasions, participated in physical confrontations with the Mother with the child present.

[4] Under West Virginia Code § 51-2A-14(f) [2005], "The circuit court must enter an order ruling on a petition for appeal within sixty days from the last day a reply to the petition for appeal could have been filed." This sixty-day timeframe is subject to an exception for when the circuit court "enter[s] an order stating just cause why the order has not been timely entered[.]" *Id*.

On May 12, 2016, the circuit court entered an order stating just cause why an order ruling on Father's and Mother's petitions for appeal would not be entered within the statutory sixty-day timeframe. The circuit court explained that it had a burdensome caseload and that: "there are over 1,117 pages of documents in the file for this case. This includes sixty (60) pages of appellate documents, and a thirty-two (32) page single spaced final order with 244 findings of fact."

3

family court erred by failing to require Mother to pay Father's attorney fees; (7) the family court erred by resolving certain factual disputes in Mother's favor; (8) the family court erred by referring to Father as a "litigation bully" in its order; and (9) the circuit court failed to give Father's petition for appeal a proper review. Mother does not appeal the circuit court's order. She requests that we affirm the circuit court.

We are asked whether the circuit court erred by refusing Father's petition for appeal from a family court order. Our standard of review is as follows:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d. 803 (2004). With this standard of review in mind, we address Father's assignments of error in turn.

First, Father argues that the family court's allocation of 50% custodial and decision-making responsibility to Mother violates West Virginia Code § 48-9-209. West Virginia Code § 48-9-209 limits a family court's discretion to award custodial or decision-making responsibility over a child to a parent who has engaged in the conduct listed in subsection (a) of the statute. This conduct includes, in part:

> (a) If either of the parents so requests, or upon receipt of credible information thereof, the court shall determine whether a parent who would otherwise be allocated responsibility under a parenting plan:
>
> . . .
>
> (3) Has committed domestic violence[;]
>
> (4) Has interfered persistently with the other parent's access to the child, except in the case of actions taken for the purpose of protecting the safety of the child or the interfering parent or another family member, pending adjudication of the facts underlying that belief; or
>
> (5) Has made one or more fraudulent reports of domestic violence or child abuse[.]

When a parent has engaged in conduct listed in subsection (a) of West Virginia Code § 48-9-209, subsections (b) and (c) of the statute require the court to take the following measures before allocating custodial or decision-making responsibility to that parent:

4

(b) If a parent is found to have engaged in any activity specified by subsection (a) of this section, the court shall impose limits that are reasonably calculated to protect the child or child's parent from harm.

. . . .

(c) If a parent is found to have engaged in any activity specified in subsection (a) of this section, the court may not allocate custodial responsibility or decision-making responsibility to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under subsection (b) of this section.

In short, under subsection (b), the family court must impose limits on the offending parent which are reasonably calculated to protect the child from harm. Under subsection (c), the family court is required to make special written findings of fact explaining that the limits it imposed are sufficient to adequately protect the child from harm.

Mother was found to have engaged in conduct listed in subsection (a) of West Virginia Code § 48-9-209. The family court determined that she interfered with Father's access to I.W. by "throw[ing] one impediment after another to the Father's meaningful parenting time with the child." Furthermore, the family court stated that Mother may have provided false testimony when she claimed that Father abused her in June 2013. As to Father, the family court indicated that he may have committed domestic abuse against Mother and expressed its "domestic violence concerns on the Father."

Father argues that the family court failed to impose limitations on Mother designed to protect him and I.W. as required under subsection (b) of West Virginia Code § 48-9-209. He further argues that, to the extent the family court imposed limitations on Mother, it failed to make special written findings of fact that he and I.W. can adequately be protected from harm, as required under subsection (c) of West Virginia Code § 48-9-209. At oral argument, Father's counsel, who drafted the family court order, argued that the family court order she prepared is not clearly written and leaves this Court to "guess" the basis for any relief it granted.

We disagree. The family court recognized in its order that Father's and Mother's contentious relationship has resulted in the harmful conduct listed in subsection (a) of West Virginia Code § 48-9-209. To remedy the harm to I.W. that might result from this harmful conduct, the family court provided that exchanges of I.W. would take place in a neutral, protected location, *i.e.*, a predesignated gas station with surveillance video cameras. The family court further provided that a family court monitor would be appointed to resolve parenting disputes between Father and Mother outside of court, subject to judicial review. The family court explicitly stated in its order that this measure would further "the expeditious, predictable decision making, [and] avoidance of prolonged uncertainty, respecting arrangements for the child's care and control." Therefore, the family court imposed limitations on Mother which were

reasonably calculated to protect I.W. from harm, as required under subsection (b) of West Virginia Code § 48-9-209, and it made special written findings of fact explaining that this measure was adequate to protect I.W. from harm, as required under subsection (c) of West Virginia Code § 48-9-209. Based on the facts before the family court at the time it entered its order, we find no error on this point.

Second, Father argues that the family court's allocation of 50% custodial responsibility to Mother violated West Virginia Code § 48-9-206(a) [2001], which provides that allocation of custodial responsibility must not be "manifestly harmful to the child." Father claims that manifest harm would result to I.W. because the family court found that Mother may have provided false testimony against Father of domestic abuse and because she interfered in Father's relationship with I.W.

We review a family court's application of law to facts under an abuse of discretion standard. *See* Syl., *Carr*, 216 W.Va. 474, 607 S.E.2d. 803. The family court determined that allocation of 50% custodial responsibility to Mother was in I.W.'s best interests, which necessarily entails that it would not be manifestly harmful to him.[5] In making that determination, the family court considered the following: Mother has been the primary caretaker for I.W. his entire life; Mother puts I.W. as a priority; and two psychologists recommended that custodial responsibility be split between Father and Mother 50/50. Given the evidence that was before the family court at the time it issued its order, we find no abuse of discretion in the family court's determination that allocation of 50% custodial responsibility to Mother was in I.W.'s best interests, and therefore, not manifestly harmful to him. We find no error under West Virginia Code § 48-9-206.

Third, Father argues that the family court erred by appointing a family court monitor to resolve parenting disputes between him and Mother outside of court, subject to judicial review. He claims that this measure was in violation of West Virginia Code § 48-9-207(a) [2001], which provides, in pertinent part, that: "Unless otherwise resolved by agreement of the parents . . . the court shall allocate responsibility for making significant life decisions on behalf of the child, . . . to one parent or to two parents jointly, in accordance with the child's best interest[.]"

We find no error under West Virginia Code § 48-9-207. The family court's order allocated shared decision-making responsibility over I.W. to Father and Mother. The purpose of the family court monitor was to provide a nonjudicial process of dispute resolution when Father and Mother are unable to agree on a decision for I.W. – not to usurp their decision-making authority. This measure is authorized under West Virginia Code § 48-9-208(b) [2001], which states, in part, that:

---

[5] For a discussion on the relationship between the "best interests" standard and the "manifestly harmful to the child" standard, *See* John D. Athey, The Ramifications of West Virginia's Codified Child Custody Law: A Departure from *Garska v. McCoy*, 106 W.Va. L. Rev. 389, 401-02 (2004).

6

> The court may order a nonjudicial process of dispute resolution by designating with particularity the person or agency to conduct the process or the method for selecting such a person or agency. The disposition of a dispute through a nonjudicial method of dispute resolution that has been ordered by the court without prior parental agreement is subject to de novo judicial review.

Therefore, we find no error in the family court's provision that a family court monitor would be appointed in this case.

Fourth, Father argues that the family court erred by failing to grant his petition to change I.W.'s last name. We have held: "Any name change involving a minor child may be made only upon clear, cogent, and convincing evidence that the change would significantly advance the best interests of the child." Syl. Pt. 3, *Lufft v. Lufft*, 188 W.Va. 339, 424 S.E.2d 266 (1992). Father argues that changing I.W.'s last name is necessary to keep him closely connected to his Puerto Rican heritage. He asserts that the family court's finding to the contrary was "racist and should not be tolerated." However, we are presented with no evidence that changing I.W.'s last name is necessary to keep him closely connected to his Puerto Rican heritage or to advance his best interests in any other way. The family court did not err when it denied Father's request to change I.W.'s last name.

Fifth, Father argues that the family court erred in calculating child support due to Mother, who is a full-time student with no job. He claims that a car Mother received as a gift from a family friend should have been attributed to her as "income." He cites West Virginia Code § 48-1-228 [2001], which provides that "gross income" for purposes of calculating child support includes: "in kind payments, such as business expense accounts, business credit accounts and tangible property such as automobiles and meals[.]" Father asserts that, because a car is an automobile, Mother's receipt of her car as a gift qualifies as an "in kind payment."

We have held that: "Undefined words and terms used in a legislative enactment will be given their common, ordinary, and accepted meaning." *Wooddell v. Dailey*, 160 W.Va. 65, 68, 240 S.E.2d 466, 469 (1976). A "payment" is commonly and ordinarily defined as "the performance of an *obligation* by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation[,]" or, "The money or other valuable thing so delivered in satisfaction of an *obligation*." Black's Law Dictionary 1243 (9th ed. 2009) (emphasis added). The car Mother received was voluntarily given to her as a gift, not as a payment. We find no error in the family court's calculation of child support.

Sixth, Father argues that the family court erred by failing to order Mother to pay his attorney fees. He cites to *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996), in which this Court outlined the factors a court should consider in determining whether to award attorney fees *in divorce actions*. This case is a custody dispute, not a divorce action. Therefore, *Banker* is not controlling in this case.

Generally, the imposition of attorney fees is a matter within the family court's discretion. Under West Virginia Code § 48-1-305(b) [2001]:

(b) The court *may* compel either party to pay attorney's fees . . . reasonably necessary to enable the other party to prosecute or defend the action[.]"

. . . .

(c) When it appears to the court that a party has incurred attorney fees and costs unnecessarily because the opposing party has asserted unfounded claims or defenses . . . the court *may* order the offending party . . . to pay reasonable attorney fees and costs to the other party."

(Emphasis added). It is well-established that, "the word 'may' is inherently permissive in nature and connotes discretion." *Daily Gazette Co. Inc. v. W.Va. Development Office*, 206 W.Va. 51, 64, 521 S.E.2d 543, 556 (1999) (internal quotations and citations omitted). We find no abuse of discretion in the family court's decision to not order Mother to pay Father's attorney fees.

Seventh, Father argues that the family court erred by resolving certain factual disputes in Mother's favor when presented with conflicting evidence. We have provided that: "findings of fact made by the family court judge [are reviewed] under the clearly erroneous standard" Syl., *Carr*, 216 W.Va. 474, 607 S.E.2d. 803. Father fails to point us to any factual finding made by the family court that was without evidentiary support. We find that the circuit court did not clearly err by resolving certain factual disputes in Mother's favor.

Eighth, Father argues that the family court erred by calling him a "litigation bully" in its order. We are pointed to no law prescribing a remedy for this alleged error. In fact, Father cited no legal authority whatsoever in arguing that the family court erred by calling him a "litigation bully." Therefore, we decline to address this assignment of error.

Father's ninth and final assignment of error pertains to the circuit court. He argues that the circuit court erred under West Virginia Rule of Practice and Procedure for Family Court 31(c) [2005] because it failed to grant him an oral argument before it refused his petition for an appeal. Rule 31(c) provides:

"**Granting Order**. If a petition for appeal is granted, the circuit court shall enter an order granting the petition for appeal. If oral argument was requested in writing by either of the parties, or if the circuit court desires oral argument, the granting order shall set forth a date and time for oral argument."

(Boldface in original). Rule 31(c) is limited to cases in which the circuit court grants a petition for appeal from a family court order. The rule clearly does not apply here, where the Father's petition for appeal was refused. Therefore, we decline to grant the Father relief under West Virginia Rule of Practice and Procedure for Family Court 31(c). In summary, we find no merit in any of the Father's nine assigned errors.

8

However, at oral argument, this Court was alerted by the Guardian ad Litem that, after the family court entered its order, circumstances regarding Father's and Mother's ability to share custodial and decision-making responsibility over I.W. may have changed.[6]  Upon this Court's request, the Guardian ad Litem submitted three documents: (1) a Guardian ad Litem's report on I.W.'s wellbeing; (2) a transcript from a hearing, conducted on August 8, 2017, in which the family court considered whether to temporarily modify its previous allocation of custodial and decision-making responsibility; and (3) an order, entered on September 28, 2017, in which the family court temporarily modified its decision to allocate 50% custodial and decision-making responsibility to Mother, pending the outcome of this appeal.  In light of these new developments, we remand this case to the family court for a new hearing as to whether a change in circumstances warrants a modification of its allocation of 50% custodial and decision-making responsibility to Mother.  The family court is directed to consider the Guardian ad Litem's report and its findings pursuant to the August 8, 2017, hearing and its September 28, 2017, order.  The hearing shall be conducted within four weeks of entry of this decision.  Finally, the clerk is directed to issue the mandate in this case forthwith.

Remanded with Instructions.

**ISSUED:**  March 8, 2018

**CONCURRED IN BY**:
Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Allen H. Loughry II
Justice Elizabeth D. Walker

---

[6] On November 16, 2016, the family court permitted the family court monitor to withdraw from this case because she was no longer engaged in the practice of law.  The family court did not appoint a replacement family court monitor in this case.  Not surprisingly, Father and Mother were unable or unwilling to cooperate in making parenting decisions for I.W., which resulted in further litigation before the family court after Father petitioned this Court for an appeal.